Arthur L. HUCKABY et al., Appellants,

v.

Leon Mitchell HUCKABY, Appellee.

No. 15291.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Sept. 12, 1968.

On Rehearing Nov. 21, 1968.

Second Rehearing Denied Jan. 30, 1969.

**602**

J. Edwin Smith, Houston, for appellants.

Paul & Aston, Kenneth A. Paul, Houston, Jack Voyles, Port Arthur, for appellee.

BELL, Chief Justice.

This is an appeal from the judgment of the District Court denying, on appeal to that court from the Probate Court, the probate of alleged will of Leon F. Huckaby dated October 18, 1953. A jury had found in answer to Special Issue No. 6 that the will had been revoked. Appellants are the surviving brother and mother of the testator who were the proponents of the will. Appellee is the son of the testator and his only heir. He contested probate on the ground it was not the last will of his father and also contended the instrument had been altered, and that, if it was entitled to be admitted to probate, it should be admitted in the form as originally drawn. The will offered for probate consisted of two typewritten pages. The testator's signature and those of the witnesses appeared on the second page of the will.

The testator was a school teacher in the Houston School District and also had an interest in the Huckaby Funeral Home. The will was witnessed by two fellow school teachers, James Charles Jones and Clytie F. Massey. Its execution was duly proven by the two witnesses and they each testified it had not been revoked so far as they knew. The will as typed showed the month of November as the date it was executed, but a line is drawn through "November" and the term "Oct." is written in ink. Mrs. Massey testified she called attention to the incorrect month and had it changed. Neither of the attesting witnesses read the will. The testator brought the will to the teachers' lounge on a school day. The execution of the will was duly proven. The contestant did introduce a calendar which showed October 18, 1953 to be a Sunday.

This will left specified property to the proponents, except money in any bank, which was left to the contestant. It appointed Arthur L. Huckaby as Independent Executor without bond.

By paragraph I specific property is given to Mrs. Katie L. Huckaby. As a part of the last line of paragraph I is the following language and immediately below is paragraph II all in the following form:

"I also bequeath all personal and real property at my death

II.

"To my beloved brother, Arthur L. Huckaby. All interest I have in yhe (sic) business known as Huckaby Funeral Service, equipment, Funeral Coaches, and, the interest I hold in the Fireside Burial Association."

The jury, on sufficient evidence, found that the words "I also bequeath all personal and real property" were not contained in the will when it was signed by the testator on October 18, 1953.

Paragraph VII provided: "My personal car shall be given to my beloved brother, Arthur L. Huckaby."

It is obvious to the naked eye that there had been an erasure where the words "brother, Arthur L." appear.

The jury, on sufficient evidence, found that the words "son, Leon Mitchell" had

not been erased prior to the execution of the will and replaced by the words "brother, Arthur L."

Based on the jury's answer to Special Issue No. 6 that the testator revoked the will offered for probate, the court denied probate.

Appellants urge there was no evidence and, alternatively, insufficient evidence to support the jury's finding that the will had been revoked.

The alleged revoking will was not produced. The evidence shows the instrument was typewritten; that the signature of testator appeared at the bottom of page 1 of the alleged revoking will and also at the top of page 2. Also the signatures of two unnamed and unknown witnesses appeared on the second page.

Leon Mitchell Huckaby was the son of the testator and Mrs. Eula Mae Harrison. They were divorced in 1940 when Leon was about a year old. The testator never remarried. Mrs. Huckaby married Albertus Harrison in 1961. Custody of the contestant was placed with the mother. The father supported the contestant, paying his way through the public school system at Port Arthur where the boy and his mother lived. Further, the father financed his son's education at Howard University for about two years. The contestant decided to discontinue his college work and joined the United States Navy. He was in the Navy at the time of his father's death. The evidence discloses a friendly relationship during all of the intervening years between the father and son and the boy's mother. There were frequent visits between them. The only difference between the father and son reflected by the record is that the father wanted his son to attend college at Prairie View, the father's alma mater, while the son wished to attend Howard University. Too, the father was disappointed that his son did not want to become a teacher and did not complete his college work.

Arthur L. Huckaby testified the testator died July 31, 1964. He had been told the will offered for probate was in the safe deposit box at the First City National Bank in Houston. The witness and his son got the will from this box. His son lived in New York but was here for the funeral. The box was in the name of the funeral home. When he got the will he turned it over to Mrs. Thomas, his sister. The will was then taken to the Probate Clerk's office by an attorney who represented him at the time. He was able to find no other will. He got the will after the funeral.

The contestant testified to the good relations that always existed between him and his father. He also testified there was a close relationship with his Uncle Arthur until after his father's death. He came home on leave from the Navy for the funeral. The funeral in Houston was August 3. The next day interment took place at Ennis, Texas. On the day following, when the family had returned to Houston, the witness went to visit a cousin of his and his Uncle Arthur was there. The uncle was jumping and waving and using profane language toward the witness. His uncle told the son that the son was contesting the will. The son, at that time, knew nothing of the will. The uncle kept telling him that he was trying to get a lawyer. This the son denied. After some talking someone telephoned and asked for the son. The telephone was answered by the uncle's son and he pointed to the contestant indicating the call was for contestant. The uncle shook his head and the young man answering the telephone said contestant was not there. After hanging up the telephone, he said it was attorney Goldsmith trying to contact contestant. Contestant denied knowing Mr. Goldsmith. Following the latter incident the uncle "got a little better". About thirty minutes later Mr. Goldsmith came to the house and introduced himself to contestant. Contestant told Mr. Goldsmith he didn't need legal counsel. Later the uncle told contestant if he fought the will contestant would get only $1.00. At

this time the uncle had three documents in his hand that he was waving. He was also shouting at contestant. A little later the uncle became composed and told contestant if he would "go along" the uncle would send him to college; help him get his doctor's degree and help him get set up in the insurance business. When contestant asked if he could read the will, the uncle said his (the uncle's) lawyer would read it to him. The uncle then said contestant could read it the next day. It was quite a number of days before he got to read the will. Contestant's father had never told him about any will. The first he ever heard about a will was from his uncle.

The uncle nowhere denied the above testimony given by contestant.

A representative of the First City National Bank testified from the business records on the safe deposit box. It was rented in the name of L. F. Huckaby. There was a co-tenant, A. L. Huckaby, whose signature was authorized. Both parties signed the rental contract. The record did not reflect the death of testator until 1965. The records show entry into the box on August 5, 1964.

Mrs. Harrison testified she and testator at one time planned to remarry but did not do so. He talked to her a number of times about remarriage. In 1957, just after contestant had gone off to college, testator came to see her at Port Arthur. He suggested they remarry. At this time testator showed her an instrument he referred to as a will and stated he was leaving everything to Leon (contestant), but if the witness would remarry him he could leave it to her. He insisted she read the instrument and she did so. The instrument offered for probate was not the one he showed her. In the instrument shown her there were no erasures and the only names on the first page were those of Leon F. Huckaby and Leon Mitchell. At the bottom of the first page was only the signature "Leon F. Huckaby." There were two pages and on the second page she saw the name Leon

F. Huckaby and below it two other names. She did not know these two persons and could not remember their names. It was dated in 1957 and testator told her he had just had "the will" drawn up.

A Mr. Buckner of Port Arthur testified. In the late Fifties testator came to see him about talking to testator's former wife about remarrying him. After talking awhile testator pulled out a document and said it was his will and he had willed his estate to his son. Testator handed him the instrument and the witness casually looked at it, but did not read it throughout. It had a blue cover. The instrument offered for probate was not the instrument testator showed him. On the instrument shown him testator's name was signed at the bottom of the page. The instrument consisted of two pages. On the second page he saw testator's name and a couple of other names. He did not know the names other than testator's. He did not know the terms of the instrument because he did not read it. Testator told him he had just recently "drawn this will up".

It was stipulated, subject to the proponents' objection that such was immaterial, that there were other parcels of real estate belonging to testator's estate other than those specially set out in the will offered for probate.

■ We have reached the conclusion that there was evidence of probative force raising the issue as to whether the proffered will had been revoked and we are also of the view that the evidence is sufficient to support the finding that it had been revoked.

■ The rule is well settled that one offering a will for probate has the burden of proving that the will has not been revoked. Section 88(b) (3) Probate Code; May v. Brown, 144 Tex. 350, 190 S.W.2d 715, 165 A.L.R. 1180 and many authorities there cited.

The term "burden of proof" as there used means the burden of persuasion. In other words, the proponent of the will must establish by a preponderance of the evidence that it has not been revoked. Where the instrument is established prima facie as a will and no suspicion is cast on its original execution, this gives rise to a presumption of continuity of the will and this suffices to support a finding of non-revocation. The burden is then cast on anyone contesting the will on ground of revocation to go forward with evidence to raise the issue as to whether the will has been revoked. May v. Brown, supra; 8 Texas Law Review 408; 6 Texas Law Review 556. The issue is raised if suspicion is cast on the will offered for probate.

Under the terms of Section 63, Probate Code, V.A.T.S., a will in writing or any clause or devise may be revoked only by a subsequent will, codicil or declaration in writing executed with like formalities, or by the testator destroying or cancelling the same, or causing it to be done in his presence.

Appellants' position is that the issue of revocation was not raised because the proof shows the alleged revoking instrument was not holographic and there is no evidence, or alternatively insufficient evidence, to show it was attested by two credible witnesses above the age of 14 years who subscribed their names thereto in their own handwriting in the presence of the testator and therefore there was no proof of a revoking instrument.

It is true there was no direct evidence of such an instrument, but we are of the view there are circumstances from which the reasonable mind could draw the reasonable conclusion that such facts existed.

As above shown by the testimony we have set out, the testator in 1957 showed the mother of the contestant and Mr. Buckner an instrument in the form of a will in that it contained the signature of testator and the names of two witnesses. The witnesses were unknown to either party testifying. However, the testator, at the time of exhibiting the instrument, stated that it was his will that he had recently had drawn up and in it had left the property to his son. These declarations by the testator were admissible on the issue of the fact of the making of a revoking will and together with other testimony casting suspicion on the 1953 will sufficient to rebut the presumption of continuity. See 4 Texas Law Review 177–179; Dannenbauer v. Messerer's Estate et al., 120 Tex. 14, 35 S.W.2d 682, 79 A.L.R. 1488, and authorities there reviewed.

There are other circumstances of particular significance tending to show there was a revoking will. There was the basically friendly attitude between testator and his only child. Prior to the death of testator the relations between contestant and his Uncle Arthur, one of the proponents and principal beneficiaries of the will, were friendly. Immediately following the burial of testator the uncle's attitude became hostile. The hostility apparently was brought about by a fear of the uncle that contestant would contest the alleged will. The uncle had three instruments he waived at contestant and told contestant they were ironclad and if contestant made a contest he would get only $1.00. The uncle refused for days to allow contestant to read the will. If it be observed that this testimony came only from contestant, it is to be noted that the uncle made absolutely no denial. Too, the uncle with his own son, who by the way did not testify, went to the safe deposit box. The uncle makes no explanation as to whether the proffered will was the only instrument he got from the box. Neither did he tell the bank on August 5, when he went to the box that his brother was dead.

All these circumstances sufficed to raise the issue of revocation.

The principal case relied on by appellants is Stewart v. Long, 394 S.W.2d 25 (Tex.Civ.App.), n. r. e. We think a reading of that case and the facts of this case will demonstrate it to be distinguishable factually from this case.

We are, however, of the view that the case must be reversed and remanded because of the failure of the trial court to give appellants' specially requested instruction as to the manner in which a will could be revoked. This related to Special Issue No. 6. The instruction requested was as follows:

"I further instruct you in connection with the foregoing special issue that no will in writing, and no clause thereof or devise therein, can be revoked, except by a subsequent will, codicil, or declaration in writing, executed with like formalities, or by the Testator destroying or cancelling the will or causing destruction or cancellation to be done in his presence.

"By the terms 'executed with like formalities' as such phrase applies to a subsequent written instrument is meant that the subsequent written instrument must be wholly in the handwriting of the deceased and signed by him, or by another person for him by his direction and in his presence, or shall, if not wholly in the handwriting of the deceased, be attested by two or more credible witnesses above fourteen years of age who shall have subscribed their names thereto in their own handwriting in the presence of the deceased."

The term "revocation" as used in connection with wills has a legal meaning. It is not a term of common understanding that need not be defined.

In this case it is especially harmful not to have given the definition because the jury might well have thought that the two changes made in the will constituted a revocation in law. That such is not true is held in Leatherwood et al. v. Stephens et al., 24 S.W.2d 819 (Tex.Com.App.); Pullen v. Russ, 209 S.W.2d 630 (Tex.Civ.App.), n. r. e.

Reversed and remanded.

On Motions for Rehearing

Appellee in his motion for rehearing complains that we erred in holding that the trial court should have given the instruction quoted in our original opinion as to how a will may be revoked. His position is that, as applied to the facts of this case, the requested instruction is not substantially correct and to have given it would, because of the peculiar facts of this case, have been misleading and confusing to the jury.

We have concluded that appellee is correct and that his motion for rehearing should be granted and the judgment of the trial court should be affirmed.

Rule 279, T.R.C.P., provides that the failure of the trial court to give a definition or explanatory instruction shall not be error unless a substantially correct definition or explanatory instruction has been requested in writing and tendered by the party complaining of the judgment. See discussion in Hodges on Special Issue Submission in Texas, Sections 65, 66 and 67. The first paragraph of the explanatory instruction requested was a quotation of Section 63 of the Probate Code and states the various ways in which a will may be revoked. A will or *any clause or devise therein* can be revoked only in the following ways:

1. Execution of a subsequent will, codicil or declaration in writing, executed with like formalities.

2. By the testator destroying the will or causing its destruction in his presence.

3. Cancellation by the testator or by his causing it to be cancelled in his presence.

The requested instruction is correct as an abstract proposition of law, but is too

broad as applied to the facts of this case. Only such explanatory instructions should be given that are material to the case on trial.

In this case the only issue raised by the evidence was whether there had been revocation by execution of another will. If the first paragraph of the requested instruction had explained that a will or any devise therein could only be revoked by a subsequent will in writing executed with like formalities, it would have been correct as applied to the facts of this case, and, when coupled with the second paragraph of the requested instruction would have been a complete and appropriate instruction.

Peculiar to this case, however, is the well supported finding of the jury that the words, "I also bequeath all real and personal property" contained on the first page of the will were not there prior to the date the testator signed the will. Further, there was the finding that the words, "son, Leon Mitchell" contained in paragraph VII in the will, had not been erased prior to the execution of the will and replaced by the words, "brother, Arthur L."

Since the requested explanatory instruction included the statement that a will or a devise therein could be revoked by "cancellation", the jury might reasonably conclude that these changes in the will were a revocation through cancellation. Yet we know such is not true under the cases cited in the last paragraph of our original opinion.

We remain of the view that a proper explanatory instruction on how a will can be revoked should be given on proper request.

Appellants' motion for rehearing is overruled.

Appellee's motion of rehearing is granted, our judgment reversing and remanding the case is set aside and the judgment of the Trial Court is affirmed.